Kevin Winston OSBORN, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5825.

Supreme Court of Wyoming.

Oct. 28, 1983.

Leonard D. Munker, State Public Defender, and Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, signed the brief on behalf of appellant. Mr. Munker appeared in oral argument.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen., and Roger Fransen, Legal Intern, signed the brief on behalf of appellee. Mr. Johnson appeared in oral argument.

Before ROONEY, C.J., and RAPER *, THOMAS, ROSE, and BROWN, JJ.

RAPER, Justice, Retired.

The appellant entered pleas of guilty to three counts on an information charging him with conspiracy to commit the crime of aggravated robbery in violation of § 6–1–203, W.S.1977, Cum.Supp.1981 [1], aggravated robbery in violation of § 6–4–402, W.S. 1977 [2], and while in perpetration of an aggravated robbery killing of another human being, Jimmy Ray O'Briant, in violation of § 6–4–101, W.S.1977 [3], all of which crimes were alleged to have been committed on May 14, 1982, in Uinta County, Wyoming. In addition, appellant was charged with and entered pleas of guilty to three counts of a separate information charging him with the crimes of aiding and abetting murder in the first degree of Audrey Ditmars in violation of § 6–4–101 and § 6–1–114, W.S.1977 [4], attempted first degree murder of Dale Moore in violation of § 6–1–201(a)(i) and § 6–1–

---

\* Retired June 13, 1983, but continued to participate in the decision of the court in this case pursuant to order of the court entered June 13, 1983.

1. Section 6–1–203, W.S.1977, Cum.Supp.1981:
 "(a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons to commit a crime and he or another person does an overt act to effect the object of the agreement.
 "(b) A person is not liable under this section if after conspiring he withdraws from the conspiracy under circumstances manifesting voluntary and complete renunciation of his criminal intention.
 "(c) A conspiracy may be prosecuted in the county where the agreement was entered into, or in any county where any act evidencing the conspiracy or furthering the purpose took place."

2. Section 6–4–402, W.S.1977:
 "Whoever forcibly and feloniously takes from the person or possession of another any property of value, by violence or by putting in fear, when a firearm or other deadly weapon is used or exhibited in the commission of the offense, is guilty of aggravated robbery and shall be imprisoned in the penitentiary for not less than five (5) years nor more than fifty (50) years."

3. Section 6–4–101, W.S.1977:
 "(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, sexual assault, arson, robbery or burglary, or by administering poison or causing the same to be done, kills any human being, or whoever purposely and with premeditated malice kills any peace officer, corrections employee or fireman acting in the line of duty, is guilty of murder in the first degree.
 "(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

4. For § 6–4–101, W.S.1977, see fn. 3.
 Section 6–1–114, W.S.1977:
 "Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

204, W.S.1977, Cum.Supp.1981[5], and aggravated robbery of Dale Moore in violation of § 6–4–402, W.S.1977[6], all of which crimes were alleged to have been committed on the 15th day of May, 1982, in Sweetwater County, Wyoming. A change of venue to Sweetwater County for the Uinta County crimes was consented to by the appellant. On the Uinta County charges, other than the felony murder, appellant was sentenced to not less than 45 nor more than 50 years on the charge of conspiracy to commit aggravated robbery of Jimmy Ray O'Briant, not less than 45 nor more than 50 years on the charge of aggravated robbery of Jimmy Ray O'Briant, to be served concurrently but consecutive to the sentences handed down on the Sweetwater County charges. On the Sweetwater County charges, the appellant was sentenced to life for the felony murder of Audrey Ditmars, life for the attempted murder of Dale Moore, and not less than 45 nor more than 50 years for the aggravated robbery of Dale Moore, all to be served consecutively.

Prior to arraignment of appellant on the charge of murdering Jimmy Ray O'Briant, the State gave notice that it would seek the death penalty for that felony murder. The foregoing sentencing to prison terms took place before the trial of appellant in the sentencing phase of the felony murder of Jimmy Ray O'Briant.[7] Following the sentencing trial for the felony murder of O'Briant, conducted without a jury before the district judge, appellant was sentenced to death and judgment was entered accordingly. Execution was stayed pending appeal.

Appellant presents as issues for our consideration on appeal:

"1. Whether the trial court erred in denying Appellant's pre-sentence motion to withdraw his guilty plea in a death penalty case.

"2. The proportionality argument—whether Appellant was denied due process and equal protection.

"3. Whether Appellant was afforded effective assistance of counsel.

"4. Whether the Wyoming death penalty provisions are unconstitutional in that they usurp the supervisory and rule-making power of the Supreme Court and expand its jurisdiction in violation of the Wyoming Constitution."

This court must go further. Section 6–4–103, W.S.1977, provides in pertinent part:

"(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

"(d) With regard to the sentence, the court shall determine if:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

---

5. Section 6–1–201(a)(i), W.S.1977, Cum.Supp. 1981:

"(a) A person is guilty of an attempt to commit a crime if:

"(i) With the intention of committing the crime, he does any act which is a substantial step towards commission of the crime. A 'substantial step' is conduct which is strongly corroborative of the firmness of the actor's intention to complete the commission of the crime * * *."

Section 6–1–204, W.S.1977, Cum.Supp.1981: "The penalty for attempt, solicitation and conspiracy is the same as the penalty for the most serious offense which is attempted, solicited or is an object of the conspiracy except that an attempt, solicitation or conspiracy to commit a capital crime is not punishable by the death penalty if the capital crime is not committed."

6. For § 6–4–402, W.S.1977, see fn. 2.

7. Section 6–4–102(a), W.S.1977:

"(a) Upon conviction of a person for murder in the first degree the judge shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted before the judge alone if:

"(i) The defendant was convicted by a judge sitting without a jury;

"(ii) The defendant has pled guilty; or

"(iii) The defendant waives a jury with respect to the sentence."

"(iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(e) The court shall include in its decision a reference to those similar cases which it took into consideration. * * *"

We will affirm the sentence of death and the other sentences imposed by the district judge.

## NARRATIVE

What ensues in this part is a composite from the testimony and exhibits adduced at the sentencing hearing, including a transcript of the arraignment proceeding at which appellant entered pleas of guilty to all charges. On April 16, 1979, appellant was sentenced in an Alabama circuit court to a fifteen-year and a five-year term to run concurrently for robbery and grand larceny respectively. He was committed to the Staton Correctional Institution, Wetumpka, Alabama. He was placed on a work program which permitted him to walk out of the prison gates to a penitentiary facility which provided chicken and eggs for the institution. While on that program, it was discovered by prison authorities that there was a hold on him for another offense from another state. This deprived him of eligibility for the outside work privilege and apparently loss of good time. He was, therefore, advised that he was confined inside the prison walls or fence. It seems the word did not get to gate guards on the next morning shift, so, on November 21, 1980, he went on through as usual and kept on going. He thereupon became an escapee.

Appellant then wandered from place to place and, as far as the record discloses, his only gainful employment consisted of odd jobs here and there with two to three weeks on a fishing boat off the coast of Florida. After that, he bought a motorcycle and again took to the road. In Oklahoma City he met up with Willard Teel, an escaped convict from the Texas prison system. At some point, a U-Haul truck was rented, and appellant and Teel drove west.

The pair then journeyed to northern California. Somewhere on Highway 101 they picked up Terry Green and Ellen Hopkins who were hitchhiking together and going nowhere in particular. Green had a criminal record and Hopkins had been arrested in New Orleans for prostitution. The foursome peregrinated across the western states into Wyoming on Interstate Highway 80, arriving in Evanston, Uinta County, on the evening of May 14, 1982.

Then there began a nightmarish course of terror for the victims of this quartet. They drove into the parking area of a motel. Hopkins went in to register, in that the stolen credit card in their possession bore a woman's name. While she was checking in at the motel desk, the other three waited in the truck cab.

While the trio was sitting there, an individual, later identified as Jimmy Ray O'Briant, came staggering by, obviously in a drunken condition on the way to his room. They then conceived a plan of robbery.

The scheme was that Hopkins would pose as a hooker, get into O'Briant's room, engage him in the attractions of that trade, arrange to leave the door ajar and the other three would burst into the room, overcome him, and strip him and the room of his money and belongings. Evanston at that time was a booming center of activity because of the rich discovery of oil in the surrounding area known as the Overthrust Belt. The robbers expected their prey to have bulging pockets due to the inflated salaries of oil field workers in the vicinity.

The scheme was carried out. Hopkins called O'Briant's room, told him she had seen him come in, thought he might be lonely because she was, and maybe they could spend the evening together. After being invited over to his room, they talked for awhile about horses and oil wells. She, according to plan, was able to leave the door slightly open. Eventually the lights in the room went off.

Then the door was opened, the lights were flipped on and the three "barged" into the room. O'Briant was on the bed wearing only a shirt. Hopkins was sitting on

the edge of the bed. Green indignantly wanted to know what O'Briant was doing in bed with his sister. After this ruse, the protestations of O'Briant were subdued and his feet were tied together and his hands were tied together as well. While Green was trying to knock out O'Briant with his fists, Teel was ransacking the room. Appellant became impatient with Green's failure to render O'Briant unconscious so he picked up one of O'Briant's boots and, holding it with both hands, struck him several times on the temples, with such tremendous force that blood squirted to the ceiling.

After taking $58.20, the only money they could find on O'Briant, appellant took his eyeglasses and boots. They beat a hasty departure, picking up their own gear, throwing it into the truck and took off again onto Interstate 80 heading east with appellant driving.

O'Briant, left unconscious on the bed, was not found until about 1:30 p.m. the next day, in a coma. He was transported to a Salt Lake City, Utah, hospital where he died two and one-half months later on July 30, 1982, never regaining consciousness. The immediate cause of death was suppurative bronchopneumonia due to and as a consequence of craniocerebral injuries.

The testimony of the Utah state medical examiner, a forensic pathologist who supervised the autopsy, was that in his opinion O'Briant more precisely died of "suppurative bronchopneumonia, secondary to blunt force injury to the head." The point of injury was on the right side of the head. A large defect—about 2½ inches in diameter—of the skull was just above the ear. As a result of the blows, the skull was fractured, with bone fragments driven into the brain area. During the process of treatment, the scalp was incised in order to remove the fragments. The incision revealed evidence of hemorrhage as well as contusions or bruising of the brain. The nature of the injury was consistent with the head having been beaten with a boot.

The medical examiner testified that bronchopneumonia is a common complication of head injuries. When a person is in a coma-tose condition for a long period of time he is bedridden, his breathing is impaired, his entire body constitution is depressed, pneumonia develops, and the patient dies. However, the cause of death is the blow to the head.

When appellant, Green, Teel, and Hopkins left Evanston about midnight of May 14, 1982, they went east and crossed over into Sweetwater County. About eight miles west of Little America, an elaborate, expansive motel, restaurant, and truck stop complex, they came upon Dale Moore, a school teacher of Surrey, British Columbia, standing alongside his disabled vehicle with its hood up. Appellant was driving the U-Haul truck. The appellant stopped, got out, went over to Moore, and offered help. Moore first asked appellant to stop at Little America and send out an AAA tow truck. Appellant talked him out of that idea. Though apprehensive, Moore accepted appellant's invitation to take him on to Little America.

Moore then went back to the disabled vehicle to tell his mother, Audrey Ditmars, age 60, that he was leaving. They were pulling a twelve foot U-Haul trailer, from Santa Cruz, California to a change of residence in Missouri Valley, Iowa when the car broke down. He told her to roll up the windows, lock herself in, and not to get out of the car. When they went to the truck, the three others were in the cab. Appellant told Moore he would have to ride in the back of the truck, so he got in and the truck doors were latched shut.

The truck went on down the road. Under the leadership of appellant, the four in the cab started making plans to rob Moore, but decided that they had better go back and pick up Moore's mother first. After gassing up the truck at a roadside station, they then turned around to return to Moore's car.

Before returning to Moore's vehicle and trailer, they pulled off the interstate onto a graveled side road. Moore, still in the back of the truck and unable to see what was going on, began to realize the possibility that foul play was underway. It had be-

come apparent to Moore that because of the time lapse they should have been at Little America and, along with the stopping, turning, and back-tracking, he perceived something suspect was going on. He had several hundred dollars in cash with him in order to get his mother established. With these developments, he removed the money from his wallet and placed it in various pockets and other places in his clothing.

When the truck stopped on the gravel road, the driver, appellant, opened up the back doors and said, "okay, get out." When Moore looked out, he saw no lights, only an isolated area in the prairie. "[W]hat's happening at this time," asked Moore, to which appellant "popped up and said, it's a robbery," held a knife to Moore's head and eyes and said, "close those fucking eyes before I cut them out." Moore became cooperative, told them to take the money and begged that he be released. "I got a wife and kids." He repeatedly pleaded for his life.

Appellant told his companions what to do. Moore was laid down, his pants legs torn to make bonds, his feet were tied, his hands were tied, the contents of his clothing were emptied into a sack and a dirty sock was stuffed into his mouth. "It tasted like it had probably been worn for days." Moore was not sure who, but one of the group stayed in the back of the truck and the doors were closed. The truck then proceeded back to the interstate highway, then west back to Moore's car. After the truck stopped, Moore was able to recognize the sound of his mother's car door being opened, then slammed shut.

Hopkins, in her testimony, then picked up subsequent events. Mrs. Ditmars was told that her son had been left at the motel and they were to take her there. Mrs. Ditmars was then escorted to the truck. In the meantime the radio was turned up so she could not hear any movement that might be taking place in the truck box. Mrs. Ditmars was seated in the cab with Hopkins, appellant, and one of the others. The other of the group stayed in the truck box with Moore as a guard to keep him quiet and subdued. The truck was driven off but

later stopped. Mrs. Ditmars was removed to the back of the truck. Hopkins was not sure what happened after that change.

The testimony of Moore continues the sequence of events which took place in the truck box. He could hear but not see what occurred and did not want to create an excuse for them to kill him. He heard his mother scream after she was brought in and with this he sat up and asked "hey, what are you doing?" He was stomped five or six times violently on the back of his head and neck. One eye, as a result, was completely swollen shut. He then recognized that a rape was going on when he heard appellant saying "go for it, man. Get it in. Do it," cheering on whoever was committing the act. After that, someone said cover her up and the truck again was driven back onto the road, one guard remaining in the rear.

In the cab, Hopkins testified appellant said "you know, we're going to have to kill them," so it was decided Terry Green would do it. They stopped, and the men went to the back of the truck. Hopkins heard struggling and Mrs. Ditmars screaming, "please, no." Moore, in the truck box, heard sounds of exertion like someone lifting weight, then a faint gurgle or gasp. One of the attackers said, "she's a tough old bird." Appellant said, "the next one's yours." Later, Moore heard his mother's bowels and bladder give in the relaxation of death.

Someone grabbed Moore by the back of his wool shirt and took a slice at his neck with a knife, but because of the heavy wool shirt and the gag, the first pass or two only cut the material. On another try, blood began to flow from a cut extending two or three inches back from his adams apple. Moore feigned a gasp and went limp. Moore was bound during this episode, feet together and hands behind his back, hands and feet then cinched together with a strap. His assailants got out, closed the doors and went to the cab. Hopkins testified that when they got into the cab they were all covered with blood.

They drove off explaining they would have to find a place to dump the bodies. Appellant was bragging about their accomplishments. The truck was driven to a gravel road, later identified as near Point of Rocks, Wyoming, in Sweetwater County.

While the truck was underway, Moore was able to break loose from the bindings and find his shoes. He intended next time the truck stopped to make a run for it. He found articles of clothing to wrap around his neck to stanch the bleeding. While struggling around he was in a pool of his mother's blood.

When the vehicle stopped and doors were flung open, Moore saw the dawn was breaking and behind the truck a sagebrush covered prairie. He threw a bottle of shampoo he had found at the persons he saw and jumped, swinging a shoe fastened to the end of the pistol belt, took off down the road, and then into the sagebrush. He was weak, stumbled and fell. He curled up, hands around his head on the ground when someone started stabbing him with a knife on the back and sides. He had fifteen stab wounds. Moore explained he tried the old gasp-and-go-limp procedure. The stabbing stopped. He was pulled into a hollow where he was laid on his back. With his eyes open, he pretended that he was dead. Some grass, dirt and sagebrush was thrown over him. Moore heard them pull his mother's body from the truck which hit the ground with a thud. Then he heard the truck driving off. Hopkins testified they threw dirt into the truck to sop up the blood.

When the truck was out of hearing, Moore stood up. It was sunup; he could see the lights of a building. He walked, fell, and crawled through a ditch or creek, across railroad tracks, through barbed wire fences, across the highway and finally collapsed in the driveway of a gas station. Someone came out and covered him with a blanket while he tried to tell what happened; sheriff's officers came.

Moore, when later shown six photographs now, in evidence for identification purposes, was able to identify appellant. He was also able to identify appellant in the courtroom. He was unable to identify his other attackers. Moore's ability to identify the appellant is rational because appellant was the one who first approached him on the highway offering help, following which conversation ensued. The testimony of Hopkins and Moore lead to no other conclusion than that appellant was the leader of this band of outlaws. It was the testimony of Hopkins that during the robberies and the killings, appellant was able to whip up a frenzy with the others in the attacks. As described in oral argument, it was like the turmoil of a school of sharks after smelling the blood of their prey.

Audrey Ditmars' body was found and recovered. The certificate of her death is in evidence. It was Moore's description of the U-Haul truck and its occupants, the broadcasts of the law enforcement network radio, and media radio news reports that led to the apprehension of appellant and his three accomplices near Laramie, Wyoming, about 175 miles east of Point of Rocks.

## ARRAIGNMENT

The arraignment of appellant, held on August 23, 1982, was a lengthy, detailed procedure, the transcript of which is 34 full pages, letter-size and single spaced. (R.Vol. I, pp. 42–76; also Exh. 1) The trial judge left no stone unturned to assure its correctness. Appellant appeared along with his attorney, State Public Defender, Leonard D. Munker. As noted earlier, the State, prior to arraignment but on the date of arraignment, gave written notice to appellant of its intent to seek the death penalty for the first degree murder of Jimmy Ray O'Briant. The appellant and his counsel had been previously advised, however, that the State planned that course of prosecution.

Appellant was first arraigned on the Sweetwater County charges as an aider and abettor in the murder in the first degree of Audrey Ditmars, in violation of § 6–4–101, W.S.1977, supra fn. 3; as a participant in the attempted murder in the first degree of Dale Moore, § 6–1–201(a)(i), supra fn. 5,

and § 6–4–101, supra fn. 3; and for his participation in the aggravated robbery of Dale Moore, in violation of § 6–4–402, supra fn. 2.

The trial judge in open court explained to appellant the purpose of the arraignment. The informations for both the Uinta and Sweetwater County crimes were read; the maximum penalties, including death as to the murder of O'Briant, were explained; appellant was asked whether he was under the influence of alcohol or drugs, to which he replied no [8]; he was asked whether he understood the possible penalties, to which he responded yes; he was asked to explain to the judge what each of the penalties was, to which he answered correctly; and appellant's right to make various possible pleas was fully laid out. The trial judge explained appellant's constitutional rights of representation by counsel; trial by jury; being proven guilty beyond a reasonable doubt; witnesses under oath; cross-examination; the presumption of innocence; producing witnesses on his own behalf; and having a speedy public trial.

Appellant reaffirmed his waiver of a preliminary hearing. He expressed satisfaction with and approval of his assigned defense counsel and verified that he had the opportunity to talk to and had talked with counsel. Appellant was advised that he would be placed under oath before answering some of the court's questions and his answers could be used against him.

It was explained to appellant that if there had been any plea bargaining, the court was not bound by it. Inquiry was made as to whether there had been any plea bargaining. The prosecuting attorneys for Sweetwater and Uinta Counties responded to the court that they had done no plea bargaining. Defense agreed there had been no plea bargaining and that the appellant

had received notice that the death penalty would be sought.

At the request of defense counsel, appellant was sworn. Appellant's counsel then read into the record a Petition to Enter Plea of Guilty, to be signed by appellant and to which was affixed a certificate of counsel to be signed by him. It was signed by appellant, after which the district judge signed it as subscribed and sworn to before him. Appellant's counsel then signed the Certificate of Counsel. In addition to it being read into the record, the original was filed and appears as part of the record on appeal. (R.Vol. I, pp. 25–29) Attached to the filed petition is an order prepared by defense counsel, but it was not signed until near the close of the arraignment by the trial judge:

"ORDER

"I find that the plea of guilty was made by the Defendant freely, voluntarily, and because he is guilty as charged, and not out of ignorance, fear, inadvertence or coercion, and with full understanding of its consequences. I further find that the Defendant has admitted the essential elements of the crime charged and is mentally competent.

"IT IS THEREFORE ORDERED that the Defendant's plea of 'GUILTY' be accepted and entered as prayed for in the Petition and as recommended in the certificate of his lawyer.

"Done in open Court this 23rd day of August, 1982.

"/s/ KENNETH G. HAMM
JUDGE
THIRD JUDICIAL DISTRICT"

We will only mention pertinent parts at this point but a facsimile of the entire document is attached as an appendix to this opinion.

---

8. In regard to drugs, appellant's counsel made the following statement during the arraignment:

"Let me say at this point, Judge, he is taking Librium four times a day, 25 milligrams each time, for a total of 100 milligrams. He's taking Percodan for purposes of a tooth. I have called a physician in regard to the current dose that he is taking and I am advised that at that dose level there is no problem; that there are many, many people conducting business and taking whatever occurs in their life in a very normal manner, so I did check on that yesterday. * * *"

The petition acknowledges that appellant understands the charges against him, all his constitutional and other rights already explained in open court and by his attorney, and that he then offered his plea of guilty to all charges freely and voluntarily. In the consideration of the issues, we will set out parts of the petition and counsel's certificate in more detail.

After this interlude, the court went on to take the pleas of guilty by his own separate and complete inquiry and without any reliance on the document filed by appellant. The trial judge then explained:

"THE COURT: Before I can accept your plea I have to find out if you are pleading knowingly and intelligently under the precepts of Boykin versus Alabama [9], and the only way I can find that out is for you to tell me about it under oath so let's swear you again. Raise your right hand. [Appellant was then administered the oath.]"

With some variations from the narrative heretofore set out, appellant's detailed explanation of the Sweetwater crimes and his participation thoroughly implicates his guilt.

The trial judge, in the same manner, then proceeded with the Uinta County crimes. After hearing the pleas of guilty to each of the counts he again swore appellant to answer under oath his inquiries as to the appellant's version of the facts of each of the counts. The Uinta County crimes were treated separately from the Sweetwater County crimes. In response to the inquiry regarding the death of O'Briant, appellant made the following statement:

"MR. OSBORN: Terry Green, myself, Miss Hopkins and Willard Teel stopped at the Dunmar Motel. Miss Hopkins went inside to register for a room with the credit card I was telling you about that came from the purse that was snatched. While she was inside registering for a room a gentleman was walking up the driveway, staggering. Apparently he was intoxicated pretty heavy. So the subject come up to rob him because this town, Evanston, was supposed to be a boom town, oil field, and people make good money. So we was registered in room 555 and he was registered in room 589. Miss Hopkins called him, posing as a prostitute, and asked him would he like to have company and he stated, I guess, yes, 'cause I wasn't on the phone, I didn't really, I didn't hear the conversation between him and her, just what she said. So she went over to his room. I followed her over to his room to make sure exactly where the room was at. I come back. When I got back we proceeded to tear up a pillowcase into strips so we could use them to tie the man's hands and feet. A few seconds later we got a phone call from Miss Hopkins from the man's room. She says the door's ajar; that was the purpose of her going over there, to leave the door open so we could enter the room. She told us the door was ajar and that everything was ready if we were. So we left and we went over there; that was myself, Terry Green, and Mr. Teel. When we got there Terry Green entered the room first, Mr. Teel went in the room and I entered the room. The room was dark, the lights wasn't on. So I reached up and I turned on the light. When I reached over and turned on the lights I walked over to Mr. O'Briant who was sitting on the bed naked waist down, and I asked him what you doing with my old lady and I slapped him. When I slapped him he laid back on the bed and I put a knife at his throat. While I stood there with a knife at his throat, Terry Green tied his hands, Willard Teel tied his feet and Miss Hopkins went through his wallet. After we got through that we had to knock him unconcious [sic] where he couldn't get to a phone to report us. So Terry Green proceeded with beating him with his fists. He couldn't knock him out so I took the boot, Mr. O'Briant's boot, and I hit him twice in the head and it knocked him unconcious [sic]. We turned out the lights and we left, went back to

9. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

our room, got into the U-haul truck and proceeded down the interstate.

"THE COURT: You hit him twice with the boot. You must have hit him pretty hard, it killed him, didn't it?

"MR. OSBORN: Yes, sir.

"THE COURT: How hard did you hit him?

"MR. OSBORN: I have no idea, sir, apparently hard enough to kill him.

"THE COURT: Why did you have to hit him? He was tied up.

"MR. OSBORN: He could have worked his way loose, I guess. I didn't mean to hit him hard enough to kill him; I just wanted to knock him unconcious [sic].

"THE COURT: But you did it while you were trying to rob him.

"MR. OSBORN: No, sir, did it after we robbed him.

"THE COURT: All part of the same act, wasn't it?

"MR. OSBORN: Yes, sir.

"THE COURT: Didn't you have any compunction about it?

"MR. OSBORN: I was drunk at the time. People has nerves when they are drunk, I guess.

"THE COURT: How much money did you get from him?

"MR. OSBORN: I think it was $58.00, sir.

"THE COURT: $58.20, wasn't it?

"MR. OSBORN: Yes, sir.

"THE COURT: A man's life for $58.20. You left him in his room?

"MR. OSBORN: Yes, sir.

"THE COURT: And you just took off?

"MR. OSBORN: Yes, sir." (R.Vol. I, pp. 66–67)

Appellant's counsel then entered in the record and read the same Petition to Enter Plea of Guilty that we have heretofore described, except that it covered the Uinta County crimes. The trial judge then accepted the plea of guilty to the Uinta County crimes charged:

"THE COURT: Uinta County, excuse me. The Court finds the defendant is alert, not under the influence of alcohol or drugs, nor suffering from any mental defect which could affect his ability to understand these proceedings and is competent to enter a plea of guilty. The plea is knowingly and voluntarily made after consultation with competent counsel, without any improper inducement or conditions and with an understanding of the charges and direct consequences. There is a factual basis for the guilty plea which the Court accepts. I want to point out one thing that in both of these, Petition to Enter a Plea of Guilty and Order Entering Plea, it is stated that there will be no further trial of any kind if he pleads guilty. However, Mr. Munker has already mentioned that. There will be further proceedings, naturally, as you pointed out, to determine whether there are sufficient aggravating circumstances that override the mitigating circumstances which we'll set for hearing at a later time and I'd like to talk with counsel after we get through in here—maybe we can arrange a time for that. In the interim the defendant will be remanded to the custody of the sheriff to be held without bail and may be transported to the Wyoming State Penitentiary pending the hearing on the aggravating and mitigating circumstances. Is there anything further?" (R.Vol. I, p. 74)

On October 4, 1982, the American Civil Liberties Union (ACLU) filed a motion to withdraw appellant's plea of guilty to the murder charge on behalf of appellant at his request on the ground that he was under the influence of drugs at the time his plea was entered. We will cover this under our discussion and disposition, Part I of this opinion. This is the only appearance in the case made by the ACLU, though assigned defense counsel kept that organization advised and urged its participation. The trial judge authorized the appearance of the ACLU and its association with assigned defense counsel to participate by submitting authority, argument, and evidence. Following a hearing, the motion was denied and an order entered accordingly.

Other facts and proceedings will be set out during consideration of the issues.

## I

■ Did the trial court err in denying appellant's presentence motion to withdraw his guilty plea in a death penalty case? We think not and, when analyzed, see no reason why the same rule and precedent applied to all other criminal cases should not be brought to bear.

Rule 33(d), W.R.Cr.P.:

"A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment or conviction and permit the defendant to withdraw his plea."

This rule is identical to Rule 32(d), F.R. Cr.P. Federal case law will therefore have relevance in the interpretation of the Wyoming rule. *Hicklin v. State*, Wyo., 535 P.2d 743, 79 A.L.R.3d 1050 (1975). In *Ecker v. State*, Wyo., 545 P.2d 641, 642 (1976), this court had occasion to examine the rule and held:

"Withdrawal of a plea of guilty before sentencing is not an absolute right. Denial by the district court is within its sound discretion and there must be a plausible reason for withdrawal. *United States v. Webster*, 9 Cir.1972, 468 F.2d 769, cert. den., 410 U.S. 934, 93 S.Ct. 1385, 35 L.Ed.2d 597; *United States v. Valdez*, 5 Cir.1971, 450 F.2d 1145. See also *United States v. Needles*, 2 Cir.1973, 472 F.2d 652. Where an exhaustive voir dire of defendant before accepting plea makes it abundantly clear that the plea was entered voluntarily, with full understanding of its consequences, and there is a factual basis, there is no abuse of discretion. *United States v. Fernandez*, 2 Cir.1970, 428 F.2d 578. When a patient and understanding judge gives every consideration to a defendant's change of position the day before trial and the defendant attempts to mock the administration of justice, there is no abuse of discretion. *Burnett v. United States*, 10 Cir.1968, 404

F.2d 29." Followed in *Schmidt v. State*, Wyo., 668 P.2d 656 (1983).

■ There is a general consensus that the withdrawal of a plea of guilty is not an absolute right and the right to do so is within the sound discretion of the trial court. *United States v. Hancock*, 607 F.2d 337 (10th Cir.1979); *Barker v. United States*, 579 F.2d 1219 (10th Cir.1978); *United States v. Barker*, 168 U.S.App.D.C. 312, 514 F.2d 208, cert. denied 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975); *United States v. Webster*, 468 F.2d 769 (9th Cir. 1972), cert. denied 410 U.S. 934, 93 S.Ct. 1385, 35 L.Ed.2d 597 (1973); *Meaton v. United States*, 328 F.2d 379 (5th Cir.1964), cert. denied 380 U.S. 916, 85 S.Ct. 902, 13 L.Ed.2d 801 (1965); Wright, Federal Practice and Procedure: Criminal 2d § 538, pp. 198–199. A presentencing withdrawal motion is measured by whether it would be fair and just to allow it. *Barker v. United States*, supra; *United States v. Barker*, supra; *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). The burden is on the defendant to establish good grounds for withdrawing his plea. *United States v. Rasmussen*, 642 F.2d 165 (5th Cir.1981); *United States v. King*, 618 F.2d 550 (9th Cir.1980); *United States v. Michaelson*, 552 F.2d 472 (2nd Cir.1977); *Pitt v. United States*, 378 F.2d 608 (8th Cir.1967); *Everett v. United States*, 119 U.S.App.D.C. 60, 336 F.2d 979 (D.C.Cir. 1964). Most of the foregoing cited authority also set out the policy to be that withdrawal of a plea of guilty before sentencing should be freely allowed but, as also indicated, that policy is frequently qualified. It has been considered an abuse of discretion to not hold a hearing whereby a defendant may develop support of his reasons for wanting to change his guilty plea. *United States v. Hancock*, supra. A trial judge does not abuse his discretion in refusing withdrawal of a plea of guilty where he carries on a careful and complete Rule 11, F.R.Cr.P.[10] hearing with the defendant as-

---

10. Rule 15, W.R.Cr.P., identical, with the exception of minor word variations, to Rule 11,

F.R.Cr.P., provides in pertinent part:

sisted by competent counsel and the defendant enters a knowing and voluntary plea of guilty. *United States v. Rasmussen, supra; United States v. Morrow,* 537 F.2d 120 (5th Cir.1976).

■ The trial judge's arraignment under the provisions of Rule 15, W.R.Cr.P., was comprehensive. The appellant answered the questions directed by the court with clarity. He was assisted by competent counsel at all stages. In addition to responding under oath to the court in a thorough interrogation by the judge as to the factual basis, the appellant signed under oath written pleas of guilty indicating he did so after being fully advised by his attorney of the consequences of doing so, including the death penalty as to the Uinta County felony murder of Jimmy Ray O'Briant. He had prior notice that the State would seek the death penalty. There was no plea bargaining, whereby there might exist some breach on the part of the State justifying withdrawal.

The appellant asserts he was under the influence of drugs at the time of his arraignment. When asked by the trial judge whether appellant was under the influence of drugs, he answered, "[n]o, sir." It was made known at the arraignment that appellant was taking medication—librium and percodan. Counsel for appellant explained to the trial judge that the possibility of that affecting his ability to knowingly and voluntarily understand the proceedings against him had been investigated before arraignment and upon medical advice "he could function, has a clear mind and he has indicated that today."

The transcript shows that the trial judge, during the course of arraignment, made the following finding:

"The Court finds that the defendant is alert, not under the influence of alcohol or drugs nor suffering from any mental defect which could affect his ability to understand these proceedings and is competent to enter a plea of guilty. The plea is knowingly and voluntarily made after consultation with competent counsel, without any improper inducement or con-

"(c) *Advice to Defendant.*—Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:
"(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and
"(2) If the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the proceeding against him and, if necessary, one will be appointed to represent him; and
"(3) That he has the right to plead not guilty or to persist in that plea if it has already been made, and that he has the right to be tried by a jury and at that trial has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself; and
"(4) That if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and
"(5) That if he pleads guilty or nolo contendere, the court may ask him questions about the offense to which he has pleaded, and if he answers these questions under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or false statement.
"(d) *Insuring that the plea is voluntary.*—The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the state and the defendant or his attorney.

\* \* \* \* \* \*

"(f) *Determining accuracy of plea.*—Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.
"(g) *Record of proceedings.*—A verbatim record of the proceedings at which the defendant enters a plea shall be made and, if there is a plea of guilty or nolo contendere, the record shall include, without limitation, the court's advice to the defendant, the inquiry into the voluntariness of the plea including any plea agreement, and the inquiry into the accuracy of a guilty plea."

ditions, and with an understanding of the charges and direct consequences.

"There is a factual basis for the guilty plea which the Court accepts * * *." (R.Vol. I, p. 64)[11]

After the arraignment, held on August 23, 1982, the ACLU, on October 4, 1982, moved to withdraw the plea of guilty on the ground that appellant was, at the time of arraignment, under the influence of librium and percodan. On September 21, 1982, appellant filed a motion to withdraw his plea of guilty. Appellant's assigned counsel, on September 22, 1982, in his Motion to Rescind the Death Penalty Request, noted defendant's intention to withdraw his plea and asserted as a basis that the plea was made while under the influence of drugs and therefore not knowingly made.

A lengthy hearing on the motion to withdraw the plea of guilty was held on October 13–14, 1982. The Sweetwater county jail administrator testified that he saw appellant daily prior to the arraignment; appellant was given his daily prescribed dosage of librium and, a week before arraignment, was prescribed percodan for a toothache. It was his observation that the medication did not affect appellant's reasoning ability or understanding. (T.Vol. II, p. 10) The last dosage of librium prior to arraignment was the night before at 9:00 p.m. on August 22, 1982. He had three dosages of percodan from about midnight of August 22–23, 1982, the last dosage being about an hour before arraignment. The jail administrator further testified that, because of a daily cell search, there was no way that appellant could have a stored supply of the drug.

The appellant, on the afternoon of August 23, the same date as his arraignment, held a press conference which had been authorized by the court at appellant's re-

quest. The jailer was present. Appellant told the media that he had pled guilty in order to attract attention and perhaps get enough public attention that someone would come in and take over his defense. No mention of drugs was made at the press conference, and he had the apparent ability to reason and understand.

The court reporter for the hearing testified that the transcript of the arraignment was a correct representation of what took place and what was said. It was then received in evidence as Exhibit 1.

Dr. Frederick Allport, a physician psychiatrist, board certified, testified. He testified that librium is used to reduce anxiety, tenseness, nervousness, fear and apprehension. Percodan is used to relieve pain. He further explained that if librium is taken in large enough dosages to disturb mental processes, there would be prominent physical symptoms such as lack of alertness, drowsiness, slurred speech, and a stumbling, staggering gait. He also explained that a dosage of 25 milligrams, such as that taken by appellant the night before, would not have impaired appellant's mental facilities. He further testified that the likelihood of percodan, in the three dosages taken over the period testified to by the jailer, causing any effect on appellant's mental abilities would be very remote.

Appellant had been taking librium in the prescribed dosages fourteen days prior to arraignment and the percodan ten days prior thereto. The doctor, on cross-examination, explained:

"A. Then the accumulative effects and the individual effects would be considerably less than they were during the first three or four days and at that dose that you gave me, the chances of that interfering with higher abstract reasoning

---

11. In addition, as previously set out but repeated for convenience, the record shows the trial judge entered a written and signed order on the date of arraignment:

"I find that the plea of guilty was made by the Defendant freely, voluntarily, and because he is guilty as charged, and not out of ignorance, fear, inadvertence or coercion, and with full understanding of its conse-

quences. I further find that the Defendant has admitted the essential elements of the crime charged and is mentally competent. "IT IS THEREFORE ORDERED that the Defendant's plea of 'GUILTY' be accepted and entered as prayed for in the Petition and as recommended in the certificate of his lawyer." (See appendix.)

abilities and that sort of thing would be very unlikely."

An experienced law enforcement officer who had the opportunity to observe people under the influence of or on drugs testified he had been present during the entirety of the arraignment of appellant. He testified that he observed appellant and that he manifested no indications that he was under the influence of drugs: his speech was not slurred; he did not appear sleepy, drowsy, or incoherent in any way; nor did he exhibit any of the effects of one under the influence of drugs.

The defense called the transport officer for the Sweetwater county jail. He testified the appellant had changes of mood and showed indications of being potentially suicidal. That was the only witness called by appellant, and nothing further was offered.

The trial judge then made a lengthy oral review of what had transpired prior to arraignment, during, and afterward. He explained appellant's examination at the Wyoming State Hospital where he had been found not mentally ill or deficient at the time of the alleged offenses. He did not lack capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a logical manner, to cooperate with his counsel, or to appreciate the wrongfulness of his conduct. Upon a hearing of competency, he was found to be competent.

The trial judge noted his own observations of appellant during arraignment. Appellant was coherent, perceptive and comprehensible; his speech was clear and his diction good; he did not weave, slur or stutter; and his behavior and stance in court was normal in all respects. The trial judge reviewed the evidence adduced at the withdrawal hearing as showing that the dosages of librium and percodan had not affected his ability to understand and think clearly.

The trial judge reviewed the law surrounding withdrawal of pleas of guilty. His understanding was substantially as we have heretofore set it out in this part of our opinion. Withdrawal is not an absolute right; it is within the sound discretion of the trial judge; and there must be a plausible reason to withdraw the plea. He added that a factual basis for the plea had been established and that appellant would not be permitted to mock the administration of justice. He thereupon denied the motions to withdraw the pleas.

■ While no argument was made at the withdrawal-of-pleas hearing, it has been obliquely hinted during oral argument to this court that perhaps appellant's pleas of guilty were conditional because of the following paragraph in appellant's Petition to Enter Plea of Guilty (see appendix to this opinion):

"(12) My plea of 'GUILTY' is made after consulting with my counsel and my desire to expedite this matter, and request the maximum permissible punishment. The Prosecution, based upon my plea, is requested and agrees to seek the imposition of the death penalty. I have been advised that the Court may accept or reject this agreement. *In the event the Court rejects this agreement, I understand that I will have the opportunity to withdraw my guilty plea.*" (Emphasis added.)

In the first place, the State, before this document was filed and before the arraignment, gave notice of its intent to seek the death penalty. The trial judge advised the appellant that the prosecutor of Uinta County had filed notice of the State's intent to seek the death penalty before the appellant's presenting and signing the Petition to Enter Plea of Guilty. He personally informed the appellant of the penalties for offenses charged pursuant to Rule 15(c)(1), W.R.Cr.P., supra fn. 10. It was not pursuant to any agreement with appellant that the State sought the death penalty. The State was not a party to the agreement. When asked by the trial judge, both the State and the appellant responded that there was no plea agreement between them.

The court meticulously followed the statutory requirements governing guilty pleas without regard to any "agreement" proposed by the appellant. The most he did

was permit it to be sworn to and filed. It was mentioned during the trial judge's announcement of his ruling on the motions to withdraw pleas of guilty, as a further support of the evidence that appellant was not under the influence of drugs; appellant stated in the petition he was not.

In paragraph (14) of the petition, it is stated:

"(14) I know that the Court will not permit anyone to plead 'GUILTY' who maintains he is innocent and, with that in mind, and because I am 'GUILTY' and do not believe I am innocent, I wish to plead 'GUILTY' and respectfully request the Court to accept my plea of 'GUILTY'."

Appellant's counsel in his certificate attached to appellant's Petition to Enter Plea of Guilty states that he advised appellant that the court was not in any way bound by the Petition to Enter Plea of Guilty. (See appendix to this opinion.)

Prior to the time the penalty hearing was held, appellant, on September 22, 1982, withdrew his request for the "maximum permissible punishment." Just before the announcement of his decision finding aggravating circumstances but no mitigating circumstances and before pronouncing the sentence of death, the trial judge stated:

"The fact that Mr. Osborn has previously requested the death penalty has no bearing on my findings and decision."

We would add that the appellant withdrew his request for the death penalty through counsel without appellant's objection to his counsel's action in that regard.

It would be a strange view of the law that the unilateral filing of a piece of paper in complete conflict with the responses given to a regular Rule 15, W.R.Cr.P. arraignment could override the approved method of pleading.

We see no merit whatsoever in this argument. We are not sure if it is even presented, except by a remote allusion. It is certainly not argued in the appellant's brief.

II

Appellant's next issue is what he refers to as the proportionality argument—wheth-

er appellant was denied due process and equal protection. His argument is basically that the sentence of death imposed upon appellant is disproportionate to the sentences imposed upon Green and Hopkins, accomplices of appellant.

Both Green and Hopkins were sentenced a month or so *before* Jimmy Ray O'Briant died in a Salt Lake City, Utah, hospital. Prior to Green's sentencing, Green killed Teel, the other accomplice, by strangulation while in their jail cell. For his murder of Teel and for his involvement in the murder of Audrey Ditmars, Green received two consecutive life sentences. Hopkins, for her part in the aggravated robbery of Jimmy Ray O'Briant, received a sentence of not less than four nor more than ten years. The State did not seek the death penalty as to either Green or Hopkins.

The appellant, through his counsel at the sentencing hearing, urged that the district judge must, in sentencing, take into consideration these sentences. In doing so, we must look at them in the same light as this court must in examining the sentence of death under § 6–4–103(d)(iii), W.S.1977, supra. That provision requires that in our review we shall determine if the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

The trial judge in his final oral ruling from the bench when he imposed the death sentence on appellant said: "Mr. Munker has also pointed out that Green killed more people than Osborn, which is true. However, in every case but one [Teel murder], the evidence indicates that Green was doing what he was told to do by Osborn. He was but an extension of Osborn's arm; a tool to be used." It will be recalled from the narrative that appellant directed Green to knock out Jimmy Ray O'Briant. When Green could not get the job done, appellant completed the effort. It will be recalled also that it was appellant who sent Green and Teel to the back of the truck to kill Dale Moore and Moore's mother Audrey Ditmars.

The Supreme Court of the United States insists on "individualized" consideration as a constitutional requirement in imposing the death sentence. *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 438 U.S. 621, 98 S.Ct. 2981, 57 L.Ed.2d 1000 (1978). The matter of discretion by prosecutors who pick those against whom to seek the death penalty and by juries in determining the death sentence was discussed in *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859, 428 U.S. 227, 96 S.Ct. 2971, 49 L.Ed.2d 904, reh. denied 429 U.S. 875, 97 S.Ct. 197, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976). The Court declared that the existence of these discretionary stages is not determinative because the specific individual convicted of a capital offense must be separately dealt with in the decision to impose the death penalty; there is nothing unconstitutional about granting mercy to one defendant and death to another. The Court went on to say that the decision to impose the sentence must be guided by standards by which the sentencing authority focuses on the particularized circumstances of the crime and the defendant. To us, this means leniency in one case does not invalidate the death penalty in others. Justice White, in his opinion concurring in the judgment, 428 U.S. at 224–226, 96 S.Ct. at 2948–2949, said that prosecutors must be free to decide whether the offense is serious enough and the evidence sufficiently strong to support the death penalty. Accomplices in crime need not be sentenced alike; a sentence should be patterned to the individual defendant. *Hopkinson v. State*, Wyo., 664 P.2d 43 (1983) (*Hopkinson II*); *Beaulieu v. State*, Wyo., 608 P.2d 275 (1980); *Daellenbach v. State*, Wyo., 562 P.2d 679 (1977).

The information charging the first degree murder of Jimmy Ray O'Briant alleged:

" * * * That Kevin Winston Osborn * * on the 14th day of May, A.D. 1982, at the County of Uinta in the State of Wyoming, did unlawfully

\* \* \* \* \* \*

"COUNT III: while in the perpetration of an aggravated robbery, kill another human being, to-wit: Jimmy Ray O'Briant, in violation of Section 6–4–101, W.S. 1977 [supra, fn. 3]."

Appellant was not charged as an aider and abettor but as the principal, and his guilt does not depend upon an association with others. In *Richmond v. State*, Wyo., 554 P.2d 1217, 1232 (1976), this court described the crime of felony murder:

" * * * Felony-murder is an unusual offense in that the death arising out of the robbery is purely an incident of the basic offense. It makes no difference whether or not there was an intent to kill. The statutory law implies all of the malevolence found and necessary in the crime of first-degree murder alone. * * * "

The perpetration of the statutory felony is regarded as standing in the place of, or as the legal equivalent of, the wilfulness, deliberation and premeditation necessary under the statute as to other first degree killings and dispenses with the necessity of the proof thereof. This rule has overwhelming support of which the following is a sampling: *State v. Sunday*, Mont., 609 P.2d 1188 (1980); *People v. Berzups*, 426 N.Y.S.2d 253, 49 N.Y.2d 417, 402 N.E.2d 1155 (1980); *State v. O'Blasney*, S.D., 297 N.W.2d 797 (1980); *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, cert. denied 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); *State v. McCowan*, 226 Kan. 752, 602 P.2d 1363 (1979), cert. denied 449 U.S. 844, 101 S.Ct. 127, 66 L.Ed.2d 53 (1980); *State v. Williams*, Iowa, 285 N.W.2d 248 (1979), cert. denied 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980); *Wade v. State*, Okl.Cr., 581 P.2d 914 (1978); *State v. Sims*, W.Va., 248 S.W.2d 834 (1978); *Garrett v. State*, Tex.Cr.App., 573 S.W.2d 543 (1978); *State v. Foster*, 293 N.C. 674, 239 S.E.2d 449 (1977); *Adams v. State*, Fla., 341 So.2d 765 (1976), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158, reh. denied 434 U.S. 977, 98 S.Ct. 541, 54 L.Ed.2d 471 (1977); *McDowell v. State*, 31 Md.App. 652, 358 A.2d 624 (1976); *Bosnick v. State*, 248 Ark. 846, 454 S.W.2d 311 (1970); *Whitman v. People*, 161 Colo. 110, 420 P.2d 416 (1966); *Wilson v. State*, 170 Neb. 494, 103 N.W.2d

258, cert. denied 364 U.S. 887, 81 S.Ct. 178, 5 L.Ed.2d 108 (1960); *State v. Jensen,* 209 Or. 239, 296 P.2d 618, app. dismissed 352 U.S. 948, 77 S.Ct. 329, 1 L.Ed.2d 241 (1956), reh. denied 352 U.S. 990, 77 S.Ct. 388, 1 L.Ed.2d 369 (1957); *State v. Rossi,* 132 Conn. 39, 42 A.2d 354 (1945); *State v. Fouquette,* 67 Nev. 505, 221 P.2d 404 (1950), cert. denied 341 U.S. 932, 71 S.Ct. 799, 95 L.Ed. 1361 and 342 U.S. 928, 72 S.Ct. 369, 96 L.Ed. 691; *Commonwealth v. Gricus,* 317 Mass. 403, 58 N.E.2d 241 (1944). Contra, *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304, 13 A.L. R.4th 1180 (1980). Michigan has no felony murder statute declaring a killing during the course of committing specified felonies to be first degree murder.

■ The felon must assume the high degree of risk of causing death involved in that act and that it will become first degree murder. Robbery, accompanied by violence, is aggravated robbery and, if violence results in death, the ultimate crime is first degree murder. It is an horrendous crime, as the case before us illustrates. Each felony murder involves not one but two crimes of violence. Its victims are the innocent. It is a crime of wanton and loathsome predators on a law-abiding society and recognized by the legislature as such.

After reflection on the rule as expressed in the vast majority of states, it appears to be a fiction devised to justify a classification as first degree murder, vestigial to the common law. However, such a justification is unnecessary. The Wyoming statute, § 6–4–101, supra fn. 3, does not relate the killing of a human being in the perpetration of robbery (or the other crimes listed) to "purposely and with premeditated malice," but separated that clause with an "or." The legislature has thus merely labeled the latter crime as first degree murder because it is considered to be of equal wickedness justifying the ultimate penalty.

In *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), cited to us by appellant, the Court was dealing with a state of facts in which the accused was an aider and abettor in a felony murder and did not himself kill the victims, intend to kill, or intend that lethal force be employed. In the case before us, appellant did intend that lethal force be employed and did kill. However, the language of *Enmund* does not require all four. Killing, an attempt to kill, or intent to kill, or intent that lethal force be employed is sufficient to support the crime of murder considered. *Enmund* does not reject murder done in the course of a robbery as an offense not proportionate to the death penalty.

Appellant argues that *Enmund* says we must focus on each individual's culpability in situations where accomplices are present and assisting in the robbery. This court has defined culpable as conduct deserving of punishment, blameworthy, censurable, a disregard of the consequences, and indifference to the rights of others. *Fuhs v. Swenson,* 58 Wyo. 293, 306, 131 P.2d 333, 338 (1942). Appellant's culpability is very simply described by stating he did employ lethal force in striking O'Briant with a boot held in both hands and swung as a bludgeon with such force that blood squirted to the ceiling and the victim's skull was crushed. He killed O'Briant. He is the culprit. His role is, therefore, considerably different than that of Enmund who did not kill nor, as analyzed by the United States Supreme Court, intend that lethal force be employed.

The trial judge found culpability and in doing so also observed that appellant did kill, did purposely hit O'Briant hard enough to kill, and that appellant was the "absolute perpetrator," a terminology employed by the appellant.

We would also note that a statutory mitigating circumstance to be balanced against the aggravating circumstances, § 6–4–102(j)(iv), W.S.1977, is: "The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor." This is a recognition by the legislature that when an individual's culpability in murder is slight, that belongs on the credit side of the calculation to determine whether the offender is to be selected for the death penalty. The trial judge would be hard put, as are we, to conclude that appellant's

participation was minor. Appellant was the ringleader. He administered the death blow. We consider the seriousness of this crime by this defendant to be in proportion to the death sentence.

■ We consider appellant's proportionality argument without merit. We will, of course, in Part V of this opinion, consider another version of proportionality which we must do under § 6–4–103(d)(iii) and (e), W.S.1977, supra, when we compare it to similar cases and make reference to those similar cases.

### III

■ The appellant raises the issue of whether he was afforded effective assistance of counsel. The same counsel who represented him in the trial court now represents him in this court. It is explained that it is questionable whether present counsel should bring this to the court's attention, but is justified in order "to pre-serve the issue and to avoid later condemnation that counsel failed to raise all permissible issues." [12] We agree with counsel for appellant that we probably would, in our review capacity in a death case, examine the record for any error, regardless of whether the question was raised in the trial court. Plain error, of course, we may consider in any appeal. An examination of the record gives us an overview of counsel's actual performance and takes into account the circumstances known to counsel at the time, upon which he should be judged. *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982). It is more timely to do that now rather than when the question becomes stale with time.

■ In *Hopkinson II,* this court considered the competency of counsel—this same counsel as a matter of fact. Leonard D. Munker is the State Public Defender, respected by this court and with a vast experience as a public defender.[13] He is knowledgeable in his responsibilities as a

12. Society's legitimate interest in finality indicates that questions which could have been litigated on direct appeal create a greater hurdle for those seeking the same relief in a collateral proceeding and may be precluded. *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816, reh. denied 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

13. Mr. Munker furnished this court, at its request, his biography; it appears at fn. 23, *Hopkinson II:*

"*D.O.B.* July 2, 1933, Ogden, Utah. *EDUCATION:* Graduate of Reno Senior High School, 1951. Attended the University of Nevada, 1952–54. Joined the U.S. Navy, 1954–58. Designated Naval Aviator, 1955. Attended the University of Kansas, 1958–60. Received a B.A. in History, 1960. Recalled in the Navy during the Cuban Missile Crisis, 1961–62. University of Kansas Law School, 1962–65. Admitted to the Kansas Bar, February 10, 1965, by examination. Admitted to the U.S. District Court for the District of Kansas, February 10, 1965. Admitted to the U.S. Court of Appeals, April 6, 1967. Admitted to the Supreme Court of the United States, December 13, 1976. Admitted to practice in Wyoming, March 21, 1979. *LEGAL EXPERI-ENCE:* Legal Editor, Shepard's Citations, 1965. Private Practice in Wichita, Kansas, November, 1965 through March, 1967. Law Clerk to The Honorable Frank G. Theis, March 1967 through September, 1969, for the U.S.Dist.Ct. of KS. Private Practice in Wichita, Kansas, 1969–71. Chief Deputy in the Office of the Attorney General for the State of Kansas, January, 1971 through April, 1971. Appointed Municipal Judge for Wichita, Kansas, April, 1971 through April, 1973. Private Practice during this period. Appointed as the Federal Public Defender for the District of Kansas, July, 1973 through December, 1981. Senior Staff, Office of the Wyoming Attorney General, September, 1978 through January, 1979. Appointed as the Wyoming State Public Defender, January of 1982 to present. *WORK EXPERIENCE:* Extensive work in criminal litigation, both trials and appeals in the District of Kansas; responsibilities included both administrative and trial work before the United States District Court for the District of Kansas in Wichita, Topeka, and Kansas City, Kansas, and approximately 3500 cases were handled by this office. Appellate work for both the Kansas Supreme Court, and the Wyoming Supreme Court and the Court of Appeals for the 10th Circuit in approximately 85 to 100 cases. National Chairman of the Federal Public and Community Public Defenders, 1980–82. Committee member and lecturer in training Federal Public Defenders."

criminal defense counsel. Counsel representing an accused, such as appellant, confronted with overwhelming evidence of guilt, particularly when the appellant desired to plead guilty, has an exceptionally difficult role with hard choices to make and few to choose from.

As was pointed out in *Hopkinson II,* supra, there are three decisions which must be made by an accused after full consultation with counsel:

1. What plea to enter.
2. Whether to waive counsel.
3. Whether to testify in his or her own behalf.[14]

Looking at the record of both proceedings, it is apparent that both the trial judge and defense counsel took great and exceptional care to assure that appellant was fully aware of his various alternatives and the consequences of pleading guilty.

There does not appear anywhere in the record any indication that appellant's counsel was not fully conversant with the obligations of defense counsel and the statutory and case law on the subject of the death penalty. At every stage he made sure that appellant knew his rights and, though the trial judge needed little help, he checked every step.

As this court held in *Hopkinson II,* supra, quoting from *Hoskovek v. State,* Wyo., 629 P.2d 1366, 1367–1368 (1981):

"A criminal defendant is entitled to an 'effective' assistance of counsel. [Citations.] The standard which we have established to determine whether or not the assistance of counsel is effective is one of 'reasonableness.' Is the assistance rendered by counsel that which would reasonably be rendered by a reasonably competent attorney under the facts and circumstances of the case? If it is, it is effective. If it is not, it is ineffective. [Citations.] The burden rests upon appellant to establish the ineffectiveness of counsel's assistance inasmuch as there is a presumption that counsel is competent and that he performed his duty. [Citations.]

\* \* \* \* \* \*

"At page 1196 of *Galbraith v. State* [Wyo.] 503 P.2d [1192 (1972) ], we quoted the following from *United States v. Rubin,* 433 F.2d 442, 444 (5th Cir.1970), cert. denied 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228:

"'"Taking a hindsight view, many convicted defendants may condemn their counsel as ineffective. But the command of the constitution is for a battle, not a victory, as Judge Goldberg pointed out for us in *Odom v. United States,* 5 Cir., 1967, 377 F.2d 853, 859. The standard was articulated by Judge Wiscom in *MacKenna v. Ellis,* 5 Cir., 1960, 280 F.2d 592, 599: 'We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.' We have never deviated from these principles. \* \* \*"'"

In *Spilman v. State,* Wyo., 633 P.2d 183, 185 (1981), it was held that the appellant must demonstrate the unreasonableness of his counsel's actions and an injury which a reasonable counsel's action would have avoided.

There are some things counsel cannot do against the will of an accused. In *Hammett v. Texas,* 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980), a pro se motion of an accused sentenced to death to withdraw a petition for certiorari, filed against his will by his appointed counsel to obtain the Supreme Court of the United States' review as to the prisoner's death, was granted. The Court held that where a prisoner under oath stated that he made his decision voluntarily and with full knowledge of the consequences after due consideration of all facts and circumstances regarding the case and

---

**14.** The court adopted Standard 4–5.2, ABA Standards for Criminal Justice, The Defense Function (Little, Brown and Company 2nd ed. 1980). See also fn. 25, Hopkinson II, in which appears the comment to that standard.

where there is no question as to his competence, there is no basis to deny withdrawal, citing *Gilmore v. Utah,* 429 U.S. 1012, 1014, 97 S.Ct. 436, 437, 50 L.Ed.2d 632 (1976).

In *Gilmore,* the accused's mother petitioned the Supreme Court of the United States for a stay of execution of his death sentence. Gilmore, through his attorney, challenged her standing to initiate any proceedings on his behalf. Gilmore had refused to even permit an appeal of his conviction to the Utah Supreme Court. The United States Supreme Court held that he had knowingly and intelligently, with full knowledge of his right to such appeal, waived that right. The Court was satisfied from the state proceedings that he was competent to do so. It was pointed out that there was no controversy involved in his waiver or in his repudiation of the action taken by his mother. The majority of the Court rejected the view of the dissent that a criminal defendant has no power to agree to be executed.

*Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), holds that while an accused has the right to counsel, he has an independent constitutional right of self representation. He may defend himself without counsel when he voluntarily and intelligently elects to do so; it is error to force him against his will to accept a state public defender and deny his request to conduct his own defense. This right may, of course, be terminated if the accused engages in serious and obstructionistic conduct. He must also not abuse the dignity of the courtroom and must comply with relevant procedural and substantive law. An accused also, in such case, cannot complain that he was denied effective assistance of counsel.

The point of this discourse is that as long as appellant had the benefit of being informed of all his rights by the court and his counsel as well, it was his personal choice to plead guilty. It is demonstrated in this record that his counsel fully informed him of all which could be expected in the prosecution, as reflected in his Petition to Enter Plea of Guilty. That was confirmed by the trial court in his interrogation. Appellant has had the benefit of effective assistance of counsel. His competence was established.

We need not decide whether appellant had a right to request the death penalty, after being fully informed and making the request voluntarily and intelligently and being competent to do so, because he later, and before any hearing, withdrew the request. The trial judge declared that the fact that he had made such a request in the first place had no bearing upon his death sentence.

We are, therefore, left to conclude that appellant had the effective assistance of counsel. We cannot find wherein appellant's counsel was ineffective. He could not force appellant to plead not guilty against appellant's will.

IV

Appellant's fourth issue asserts that the Wyoming death penalty provisions are unconstitutional in that they usurp the supervisory and rule-making power of the supreme court and expand its jurisdiction in violation of the Wyoming Constitution. This same contention was made in *Hopkinson II* wherein we thoroughly discussed the entire concept and concluded that there is no constitutional conflict between the legislative and judicial branches of government in that regard.

██ As said in *Hopkinson II,* the most important reason for holding that §§ 6–4–102(g) and 6–4–103, W.S.1977, are a proper legislative function is that they are substantive—important and necessary parts of the total sentencing structure. What the punishment shall be for prohibited acts belongs to the legislative branch as an absolute, exclusive and inherent power not shared with the courts of Wyoming. In framing an acceptable procedure to be followed before finally imposing the death sentence, the legislature was restrained by federal constitutional provisions and guarantees which required as conditions to its availability prescribed procedures to assure accepta-

ble standards to guide the sentencing authority. These procedures are substantive to the protection of the personal rights of the accused. We will not reconsider the question.

## V

■ We can find no evidence in the record that "[t]he sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," one of the determinations we must make under the provisions of § 6–4–103(c), (d), and (e), W.S.1977, supra. We find that all proceedings preliminary to imposition of the death penalty were conducted with exceptional care, including the arraignment, all motions, required notices, and hearings. The appellant was afforded unlimited opportunity to present anything he desired, including the opportunity to conduct a press conference.

Pursuant to the provisions of § 6–4–103(b), W.S.1977, the trial judge submitted with the record a report to this court "in the form of a standard questionnaire prepared and supplied by the supreme court of Wyoming." (R.Vol. I, p. 124) The multitude of answers to the questions reveal nothing which would show the presence of bias, prejudice or any other arbitrary factor. It was submitted to defense counsel for comment. Defense counsel's response was:

"I am in receipt of your letter dated October 15, 1982, concerning the form to be submitted to the Supreme Court. I have reviewed the same and find that your answers are factually accurate and therefore, I have no comments regarding the statistics requested by the Supreme Court. However, I would like to add that my treatment before your Court was in all respects thoughtful, patient, and courteous and that you, as trial judge, set a high standard in allowing defense counsel to make whatever comments or arguments that were necessary for the record.

"Sentencings have customarily been the prerogative of a judge except in death penalty cases and because of the procedures set forth in Section 6–4–102, that burden normally designed for a jury has become a judicial burden. As you recall in the course of the trial, I raised Section 6–4–103(d)(i) as a factor guiding the Court's conduct to be reviewed on appeal. I was personally touched by the sensitivity that you showed during the course of the trial and the weight that you gave in deciding all issues, both favorable and unfavorable, to my client. Your sentencing was judicial and considerate. I was under the impression that my client could have avoided the death penalty issue if it were not for his behavior and his state of mind. I regret that his excesses provoked the prosecution to pursue the ultimate punishment."

## VI

■ We have determined that "[t]he evidence supports the jury's or *judge's* finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] [15] and a

15. Section 6–4–102(h) and (j), W.S.1977:

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney or former county and prosecuting attorney, during or because of the

lack of sufficient mitigating circumstances which outweigh the aggravating circumstances." (Emphasis added.)

The State confined itself to establishment and proof that the murder was committed (i) by a person under sentence of imprisonment, and (ii) the defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person.

To prove that the appellant was under sentence of imprisonment, the director of inmate records for the State of Alabama testified about, and brought with him, the records of appellant's conviction and sentence to Staton Correctional Institution, Wetumpka, Alabama, for the crimes of robbery for which he was sentenced to fifteen years and grand larceny for which he was sentenced to five years to run concurrently with the sentence for robbery, both of which were to run concurrent with a federal sentence. The records included a photograph and fingerprints. This witness identified appellant in the courtroom by the photograph. The warden of the Staton institution testified that while he was in that capacity he became acquainted with appellant as a prisoner. He explained how appellant was informed of the necessity of taking him off of trustee status because of receipt of a detainer from the State of Louisiana. That information did not get to the gate, so the next morning appellant went through the gate as usual to report to what had been an outside-the-wall work assignment in the institution's "chicken house," a facility where chickens were raised and eggs produced for institution use. Appellant kept going, rather than reporting for work, and thereupon became an escapee on November 21, 1980, and had not been seen or heard from until his apprehension in Wyoming. Appellant's term had a number of years yet to be served. The warden identified appellant in the courtroom as the escapee from his prison. Appellant admitted during arraignment all of the foregoing. There can be no doubt that appellant was under a sentence of imprisonment at the time of the murder.

The aggravating circumstance, that the appellant was previously convicted of another murder in the first degree, is fully supported by the evidence, also of which there can be no doubt. Prior to the death penalty hearing and sentencing, appellant was sentenced on his pleas of guilty to the Sweetwater County crimes—life for aiding and abetting the murder of Audrey Ditmars, life for the attempted first degree murder of Dale Moore, and forty-five to fifty years for the aggravated robbery of Dale Moore, all sentences to run consecutively.[16] The clerk of the district court provided a certified copy of the Judgment and Sentence which was received into evidence. There was no doubt about the identity of appellant since the sentencing judge was the same in all proceedings involving appellant. In addition, the testimony of Miss Hopkins and Dale Moore linked those crimes with appellant and identified him. Appellant's own admission in the arraignment proceedings was also in evidence.

exercise of his official duty. [Subsection (h)(viii) was amended 4/1/82.]

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"(v) The defendant acted under extreme duress or under the substantial domination of another person;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(vii) The age of the defendant at the time of the crime."

16. At the same time, previous to the death penalty hearing and sentencing, appellant was sentenced on the other Uinta County offenses: conspiracy to commit robbery and aggravated robbery, forty-five to fifty years each, to run concurrently but consecutively to the Sweetwater County sentences.

We set forth the method of proof of previous convictions in *Chavez v. State,* Wyo., 604 P.2d 1341, 1350–1351 (1979), cert. denied, 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). This case established the proof required for the status of an habitual criminal for purposes of an enhanced punishment. The proof consists of two elements, (1) former convictions of the felonies, and (2) identity of the accused as the person previously convicted. See also Annot., Evidence of identity for purposes of statute as to enhanced punishment in case of prior conviction, 11 A.L.R.2d 870.

We have heretofore held in *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981) (*Hopkinson I*),[17] cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), that previous convictions within § 6–4–102(h)(ii), W.S.1977, supra fn. 15, may occur contemporaneously in the same prosecution in which the death penalty is imposed. In the case now at hand, the murder of Audrey Ditmars, the attempted murder of Dale Moore, and the aggravated robbery of the latter took place in early morning hours on May 15, 1982. It was shortly before midnight on May 14, 1982, that appellant struck the death blow to the head of Jimmy Ray O'Briant which, two and one-half months later, on July 30, 1982, resulted in his death. The crime of murder in the first degree did not ripen until O'Briant's life expired. According to our construction of the Wyoming statute, the previous convictions, including sentencing, took place "previous" to the hearing and sentencing of appellant to death for the murder of Jimmy Ray O'Briant.

With respect to the statutory mitigating circumstances, listed in § 6–4–102(j), supra fn. 15: (i) the appellant did have a significant history of prior criminal activity; (ii) there is no indication that appellant was under the influence of extreme mental or emotional disturbance [18]; (iii) the victim certainly was not a participant in defendant's conduct and did not consent to being struck and killed; (iv) this is not a case where the appellant was an accomplice in a murder committed by another, though others participated and were a part of the crime; appellant's homicidal act was far from relatively minor in that his act was what killed the victim; (v) the defendant was not under any duress or the domination of another person; to the contrary he was the leader; (vi) as previously indicated, fn. 18, appellant had the capacity to appreciate the criminality of his conduct; there was no impairment to prevent his conformance to the law; he was in fact an experienced criminal; (vii) age would not be a factor in that he was an adult, age 25.

There was testimony by the clinical psychologist that the appellant was suffering from mental distress, depression, suicidal tendencies, along with previous alcohol and drug abuse. Appellant claims these conditions to be mitigating circumstances; this was argued to the trial judge but was not found to be such. He found no mitigating circumstances. While these conditions argued by appellant may be present, they can hardly be considered to be "extreme" as required by § 6–4–102(d)(ii), supra fn. 15, such as to mitigate the seriousness of the crime. These reasons could not excuse appellant from the death penalty, in that they seem to be the result of the sort of life the appellant had elected to lead. The trial judge as the fact finder found them not so extreme as to be mitigating. We have no reason to disagree with the trial judge from our own examination of the record. As he

17. Citing *Lucas v. State,* Fla., 376 So.2d 1149, 1152–1153 (1979).

18. Appellant was examined at the Wyoming State Hospital. As a result of the examination, the trial judge entered an order, on the date of arraignment, which was not contested, stating: "At the time of the alleged criminal conduct on May 14, 1982, relating to all charges in Uinta County, did not as a result of mental illness or deficiency, lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."
It is also noted that at the trial a clinical psychologist testified that appellant has an anti-social personality which manifests itself in a lack of feeling, empathy, and consciousness for others and others' property.

concluded, we conclude that there are no mitigating circumstances to balance against the aggravating circumstances.

We would also agree with the trial judge that other aggravating circumstances probably were present; but, since the State did not stand on them, they were not to be considered in the calculus. Nor do we consider them. In any event, they surface as a part of the total picture of appellant's individual part in a series of violent crimes encompassing a period of less than eight hours.

## VII

 Our final issue is to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and cite those similar cases which we have taken into consideration. Previous to our decision in *Hopkinson II,* supra, this court had not had occasion in its past history of the death penalty to compare the circumstances of similar cases. At that time we did not have the stringent requirements of *Gregg, Proffitt,* supra, and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, reh. denied 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976) and the provisions of § 6–4–103(d)(iii), W.S.1977, supra, to " * * * determine if * * * [t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant."

In *Hopkinson II,* under the provisions of Wyoming's current death sentence statutes, we approved the death penalty. The defendant, while under a sentence of imprisonment, as an aider and abettor, directed and paid hired killers to torture and murder another to prevent the victim's testimony before a grand jury, to elicit information to which the victim would testify, and to prevent his own arrest and conviction. He had also been previously convicted of murder in the first degree, though as the leader accomplice. We would consider the circum-

stances of that murder perhaps more extraordinary than the usual murder, even more than the murder by appellant in this case. Both defendants, however, have the same cold-blooded disregard for another's life established by a history of violent crime.

In *Hopkinson II,* supra, we considered other death sentences that had been imposed in this state for crimes having a level of seriousness considered appropriate for the death sentence. We will again examine those same cases here. The last death sentence imposed by a court of Wyoming and carried out by execution was in 1965, *Pixley v. State,* Wyo., 406 P.2d 662 (1965). Pixley was prosecuted for murder in the first degree under § 6–54, W.S.1957. The penalty was death unless the jury qualified their verdict by adding "without capital punishment." None of the complexities surrounding the reaching of the death sentence then existed as are now present. While not then appearing in any statute, this court declared that the legislature had left it to jury decision whether in a particular case the crime was deserving of the extreme penalty. While all the details of the offense do not appear in the opinion, the scant information appearing disclosed that the defendant raped and murdered two girls of tender years. In *State v. Brown,* 60 Wyo. 379, 151 P.2d 950 (1944), the defendant was sentenced to death for the murder of a seventy-year-old woman by striking her on the head, accompanied by a rape. Her body was found on the grave of a dog. Again, these were not cases controlled by the proscriptions of the modern rule.

Following *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), the legislature of Wyoming enacted a death penalty statute which it considered to be within the directions of that case. Section 6–54, W.S.1957, Cum.Supp. 1975 (§ 1, ch. 136, Session Laws of Wyoming 1973).[19] It was held unconstitutional by this court and the death penalty set

---

**19.** Section 6–54, W.S.1957, Cum.Supp.1975, provided:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, rob-

aside in *Kennedy v. State,* Wyo., 559 P.2d 1014 (1977). The published case report does not relate any of the specific details of the murder in that case, but by reference to the files of this court, the facts are revealed. Amy, age 11 and Rebecca, age 18, sisters, were kidnapped at knifepoint from a parking lot in Casper. They were choked, held down by force, and driven to the vicinity of a bridge crossing a deep canyon near what is known as Alcova Lake. Amy was thrown off the bridge landing with such force on a rock far below that the cervical spinal axis was driven through the skull into the brain. She was then washed into the stream and found in 30 feet of water the next day. Rebecca was raped by both defendants and then also thrown off the bridge. She, however, struck the side of the canyon which broke her fall, ended up in the water, and was able, in spite of a broken pelvis and hip, to pull herself part way up the canyon wall where she was found the next day. The little girl was killed and an attempt made to kill the older girl to prevent detection of the defendants. Under the provisions of the then-existing law, first degree murder committed in the course of a kidnapping and first degree murder to conceal identity, to conceal the fact of commission of a crime, or to suppress evidence were considered "a course of conduct" justifying the death penalty. The jury recommended the death penalty. On appeal, the facts and circumstances of the murder were not contested—only the constitutionality of the death penalty. The torture-killing, in the case now before us, was at least as horrendous as the murder of Amy, terrible as that was.

Another first degree murder case, tried under the same law as that under which the

bery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

"(b) Upon conviction of murder in the first degree, a mandatory sentence of death in the manner provided by law shall be imposed if the trier of fact finds the offense involves the following course of conduct:

"(i) Murder of any peace officer, corrections employee or fireman acting in the line of duty;

"(ii) A murder committed for profit or reward of any kind by a defendant after being hired by any person, or the employment or inducement of another to commit murder;

"(iii) Intentional murder by the unlawful and malicious use or detonation of any explosive;

"(iv) Murder committed by a person who had previously been convicted of murder in the first or second degree;

"(v) Murder committed by a defendant while under the sentence of life imprisonment;

"(vi) Murder committed in the perpetration of or attempt to perpetrate a rape where the defendant had previously been convicted of rape; murder committed in the perpetration of or attempt to perpetrate arson where the defendant had previously been convicted of arson; murder committed in the perpetration of or attempt to perpetrate a robbery where the defendant had previously been convicted of a robbery; murder committed in the perpetration of or attempt to perpetrate a burglary where the defendant had previously been convicted of a burglary;

"(vii) Murder of any person perpetrated in the course of a kidnapping;

"(viii) Murder in the course of the hijacking of a commercial airplane, train, bus, boat or other commercial vehicle;

"(ix) Murder committed by a defendant to conceal his identity or to conceal the fact of the commission of a crime, or to suppress · evidence;

"(x) Murder of two or more persons in one series of related events.

"(c) In courses of conduct described in paragraphs (iv), (v) and (vi) above, the determination of prior conviction shall be made by the jury after the jury has returned its verdict of conviction.

"(d) The judgment of conviction and sentence of death shall be subject to automatic review by the supreme court of Wyoming. Such review shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the supreme court.

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life.

"(f) All offenses committed and all prosecutions commenced under the law providing for first degree murder in force prior to the effective date of this act shall remain punishable and be prosecuted as provided by that act, and to that extent that act remains in full force and effect; and this act shall not affect any rights or liabilities accrued, penalties incurred or proceedings begun prior to the effective date of this act."

*Kennedy* case was prosecuted, was *Cloman v. State,* Wyo., 574 P.2d 410 (1978), in which the jury recommended the death penalty for first degree murder. The case report relates the details of the murder. The two defendants entered the home of the Witts. They complained of the bitter cold outside, their car had broken down, and they had walked several miles. They persuaded Mr. Witt to take them into Cheyenne, some twelve miles away. Mr. Witt picked a friend, Mr. Davis, to go along on the ill-fated journey. Their bodies were found after an extensive search. Each body bore as many as a dozen stab wounds, several of which in each body were testified to by the examining pathologist as sufficient to cause death in that they were of both lungs, accompanied by severe intra-pulmonary hemorrhage.

The jury in the *Cloman* case found aggravating conduct of murder of any person perpetrated in the course of a kidnapping and murder of two or more persons in one series of related events. This court sustained the verdict of guilty of premeditated murder (there were other questions of felony murder), but again set aside the death penalty, as unconstitutionally imposed, citing *Kennedy v. State,* supra.

It is difficult to compare *Kennedy* and *Cloman* because the death penalty was mandatory if the aggravating circumstances were present, so fact-finder discretion was out of the picture. The cases can only be compared as to circumstances in which a jury representing the community was willing to and did return a verdict of the death penalty. The details of appellant's crime, here, are every bit as offensive to one's senses as those in *Kennedy* and *Cloman.*

The decisions from the courts of other states, from whence came the legislation under consideration, are very persuasive when applying statutes which are identical or very similar to those enacted by our own legislature. *Woodward v. Haney,* Wyo., 564 P.2d 844 (1977). However, comparing this case to cases in Florida and Georgia—states with statutes upon which ours is modeled— we find that the sentence here is not excessive. The Florida cases which have been cited approvingly by the Supreme Court include:

" * * * *Hallman v. State,* 305 So.2d 180 (1974) (victim's throat slit with broken bottle); *Spinkellink v. State,* 313 So.2d 666 (1975) ('career criminal' shot sleeping traveling companion); *Gardner v. State,* 313 So.2d 675 (1975) (brutal beating and murder); *Alvord v. State,* 322 So.2d 533 (1975) (three women killed by strangulation, one raped); *Douglas v. State,* 328 So.2d 18 (1976) (depraved murder); *Henry v. State,* 328 So.2d 430 (1976) (torture murder); *Dobbert v. State,* 328 So.2d 433 (1976) (torture and killing of two children). * * * " *Proffitt v. Florida,* 428 U.S. 242 at 255, 96 S.Ct. 2960 at 2968, fn. 12, 49 L.Ed.2d 913 (1976).

The Georgia cases cited approvingly in *Godfrey v. Georgia,* 446 U.S. 420, 432, 100 S.Ct. 1759, 1766, 64 L.Ed.2d 398 (1980), reh. denied 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982), fn. 14, include: *Thomas v. State;* 240 Ga. 393, 242 S.E.2d 1 (1977), reh. denied 438 U.S. 908, 98 S.Ct. 3129, 57 L.Ed.2d 1151 (1978) (victim was decoyed and robbed at gunpoint, then struck on the head with a hammer, shot with a pistol, jabbed with the cutting point of a shovel, and buried alive while pleading for his life); *Stanley v. State,* 240 Ga. 341, 241 S.E.2d 173 (1977), cert. denied 439 U.S. 882, 99 S.Ct. 218, 58 L.Ed.2d 194 (1978) (Thomas' accomplice in preceding case); *Dix v. State,* 238 Ga. 209, 232 S.E.2d 47 (1977) (defendant's former wife was deliberately and methodically tortured by being cut and carved as well as strangled before being killed); *Birt v. State,* 236 Ga. 815, 225 S.E.2d 248 (1976) (defendant hired to burglarize house of victims who were tortured by repeated strangulation and burned with cigarette lighters); *McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974), cert. denied 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218, reh. denied 429 U.S. 873, 97 S.Ct. 190, 50 L.Ed.2d 154 (1976) (seventeen-year-old victim's genitals were burned and cut, she was then raped and strangled, and finally defendant grabbed her head and twisted it in order to break her neck).

We thus conclude that when comparing the murder in this case to the murders in other cases where the death penalty has been imposed, it is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This was not the ordinary murder.

We find no circumstances in the record which indicate that "[t]he sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Section 6–4–103(d)(i), W.S.1977.[20] We find no reason at all to reverse the death penalty on any score. In conclusion, after thoroughly examining the record, we have determined that the appellant received a fair trial during the penalty phase in every respect and his execution should be carried out.

Affirmed as to all sentences with directions to the judge of the district court pronouncing the sentence of death to fix a new date therefor and for the taking of all necessary steps in connection therewith pursuant to the provisions of § 7–13–901, et seq., W.S.1977. We provide, however, that the execution shall be stayed pending an opportunity to timely seek certiorari to the Supreme Court of the United States.

## APPENDIX

| | |
|---|---|
| THE STATE OF WYOMING, | ) IN THE DISTRICT COURT |
| | ) THIRD JUDICIAL DISTRICT |
| Plaintiff, | ) FOR THE STATE OF WYOMING |
| | ) DOC. _____ NO. _4287_ |
| vs. | ) PETITION TO ENTER PLEA OF GUILTY |
| | ) AND ORDER ENTERING PLEA |
| KEVIN WINSTON OSBORN, | ) |
| Defendant. | ) [Rule 15, W.R.Cr.P.] |

The Defendant represents to the Court:

(1) My full true name is Kevin Winston Osborn. My date of birth is November 3, 1956. I am 25 years of age. I have gone to school up to and including the eighth grade and have obtained a G.E.D. I request that all proceedings against me be in my true name.

(2) I am represented by Leonard D. Munker, State Public Defender, Cheyenne, Wyoming.

(3) I received a copy of the Information before being called upon to plead. I read the Information and have discussed it with my lawyer. I fully understand every charge made against me, and have had the opportunity to propound questions to the Court (Judge Soule), and have been provided a brief on the elements of felony murder, that I have had time to deliberate on my actions and have knowingly and voluntarily, with the understanding of the charges against me, waived my right to a preliminary hearing.

(4) I have discussed with my lawyer all the facts and circumstances known to me about the charges made against me in the Information. I believe that my lawyer is fully informed on all such matters.

(5) I know that the Court must be satisfied that there is a factual basis for a plea of "GUILTY" before my plea can be accept-

20. All statutory sections cited and quoted in this opinion are as they were by number and content during the period pertinent to this case. In 1982, the criminal code of Wyoming was revised, effective July 1, 1983. In 1983, the new criminal code was further revised and amended, also effective July 1, 1983. The revisions changed the section numbers and, in some cases, the language of applicable provisions. We consider it unnecessary, so we make no attempt to make any cross-references to the revisions. Section 6–1–101 of the Wyoming Criminal Code of 1982, as amended, specifically provides that "[p]rosecutions for a crime shall be governed by the law in effect on the date when the crime occurred."

ed. I represent to the Court that I did the following acts in connection with the charges made against me in the Counts:

## COUNT I

On May 14, 1982, in the city of Evanston, county of Uinta, State of Wyoming, I conspired, acted, and agreed with Willard Eugene Teel, Ellen Duncan Hopkins, and Terry Lee Green, to commit the crime of aggravated robbery in violation of Section 6–4–402, 1977 Wyoming Statutes.

## COUNT II

I, with others, forcibly and feloniously took money in the amount of $58.20, a pair of cowboy boots, and a pocket knife from Jimmy Ray O'Briant, by putting him in fear by use of force (exhibiting a knife) in the commission of robbery.

## COUNT III

While in the perpetration of the aggravated robbery, I acted as a principal and in concert with others in assaulting Jimmy Ray O'Briant causing his death in violation of Section 6–4–101, 1977 Wyoming Statutes.

(6) My lawyer has counseled and advised me on the nature of each charge, on all lesser included charges, and on all possible defenses that I might have in this case; that it is his opinion that the death penalty is applicable to the facts in this case based upon the Supreme Court's opinion, *Enmund v. Florida,* decided July 2, 1982.

(7) I know that I have the right to plead "NOT GUILTY" to any offense charged against me. If I plead "NOT GUILTY" I know the Constitution guarantees me (a) the right to a speedy and public trial by a jury; (b) at that trial, and at all stages of the proceedings, the right to the assistance of a lawyer; (c) the right to see and hear all witnesses called to testify against me, and the right to cross-examine those witnesses; (d) the right to use the power and process of the Court to compel the production of any evidence, including the attendance of any witnesses in my favor; and (e) the right not to be compelled to incriminate myself by taking the witness stand; and if I do not take the witness stand, no inference of guilt may be drawn from such failure.

(8) I know that if I plead "GUILTY", I am thereby waiving my right to a trial, and that there will be no further trial of any kind, either before a Court or jury; and further, I realize the Court may impose the same punishment as if I had pleaded "NOT GUILTY", stood trial, and been convicted by a jury. I am further advised that my plea of guilty waives all nonjurisdictional defects and the possibility of habeas corpus review in the Federal Courts.

(9) I know that if I plead "GUILTY", the Court will ask me questions about the offense(s) to which I have pleaded, and since I will be answering these questions under oath, on the record, and in the presence of my lawyer, that my answers may later be used against me in a prosecution for perjury or false statement.

(10) My lawyer informed me that the plea of "GUILTY" could subject me to a maximum punishment which, as provided by law, is five to fifty years on Count I, five to fifty years on Count II, punishment by death or life imprisonment, according to law, on Count III.

(11) I declare that no law enforcement officer or agent, prosecutor or the Court, or my own counsel has made any promises, suggestions or inducement in an effort to obtain my plea of "GUILTY"; that at my request my counsel has acted as directed, that I knowingly waive my right to trial and that I request the maximum sentence be imposed for the offenses that I have committed.

I know that the sentence I will receive is solely a matter within the control of the Court. I do not request leniency, and I am prepared to accept the maximum punishment permitted by law which the Court sees fit to impose.

(12) My plea of "GUILTY" is made after consulting with my counsel and my desire to expedite this matter, and request the

maximum permissible punishment. The Prosecution, based upon my plea, is requested and agrees to seek the imposition of the death penalty. I have been advised that the Court may accept or reject this agreement. In the event the Court rejects this agreement, I understand that I will have the opportunity to withdraw my guilty plea.

(13) I believe that my lawyer has done all that anyone could do to counsel and assist me, AND I AM SATISFIED WITH THE ADVICE AND HELP HE HAS GIVEN ME.

(14) I know that the Court will not permit anyone to plead "GUILTY" who maintains he is innocent and, with that in mind, and because I am "GUILTY" and do not believe I am innocent, I wish to plead "GUILTY" and respectfully request the Court to accept my plea of "GUILTY".

(15) My mind is clear. I am not under the influence of alcohol or drugs, and I am not under a doctor's care. I acknowledge I have been examined by the Wyoming State Hospital in July of this year, that I have read the reports and the conclusions therein, and further, I have been examined and counseled by Dr. Brian Miracle in July and August of this year.

(16) I have been examined on at least two occasions by institutions treating mental illnesses. I have never been adjudicated mentally incompetent. No psychiatrist, physician or psychologist has ever found me to be mentally ill. I know of no reason why my mental competence at the time of the commission of the alleged offense(s), or at the present time, should be questioned.

(17) I offer my plea of "GUILTY" freely and voluntarily, and further state that my plea of guilty is not the result of any force or threats against me, or of any promises made to me other than those noted in this petition. I further offer my plea of "GUILTY" with full understanding of all the matters set forth in the Information and in this petition, and in the certificate of my attorney which is attached to this petition.

(18) I understand that the acts charged in the Information occurred in the city of Evanston, county of Uinta, State of Wyoming, and that this case could be prosecuted in that county. With this understanding, I request the case be prosecuted in Sweetwater County and consolidated with the offense(s) charged in that county. I acknowledge my right to have separate trials in this matter and I knowingly, voluntarily, and understandingly waive venue and separate trials and request that these cases be consolidated for simultaneous disposition.

(19) I swear that I have read, understood, and discussed with my attorney, each and every part of this Petition to Plead Guilty, and that the answers which appear in every part of this petition are true and correct.

Signed and Sworn to by me in open Court, in the presence of my attorney, this 23 day of Aug, 1982.

/s/ Kevin Osborn
Defendant

Subscribed and Sworn to before me this 23rd day of August, 1982.

/s/ Kenneth G. Hamm
District Judge

## CERTIFICATE OF COUNSEL

The undersigned, Leonard D. Munker, State Public Defender, Cheyenne, Wyoming, as lawyer and counselor for the Defendant, hereby certifies:

(1) I have read and fully explained to the Defendant the allegations contained in the Information in this case.

(2) To the best of my knowledge and belief, the statements, representations and declarations made by the Defendant in the foregoing petition are in all respects accurate and true.

(3) The Defendant is in accord with my understanding of the facts presented to me by the prosecution and related to me by the Defendant and that the plea is motivated by the Defendant's desire to avoid a trial, obtain quick disposition of his case, and to seek the death penalty. He desires the maximum penalty and asks that I make this recommendation to the Court. The plea is

knowingly, voluntarily, and accurate and meets the standards as I understand them. Further, the alternatives available to Kevin Winston Osborn have been outlined and those considerations he deemed important are set forth in this Petition to Plead Guilty. The trial judge has not been a participant in any plea discussions and the Defendant has been advised that the Court is not bound in any way in the Defendant's Petition to Plead Guilty or recommendations made by the prosecution.

(4) In my opinion, the Defendant's waiver of his preliminary hearing in open Court was voluntary and understandingly made and I recommend to the Court that the waiver be accepted.

(5) In the exercise of my independent professional judgment, I have advised my client that if the Prosecution sought the death penalty on the offense(s) charged in Uinta County, that there was a possible factual basis for the imposition of the sentence of death. I have further advised my client that the death penalty requires a separate hearing with the presentation of evidence of mitigating and aggravating circumstances and that in the event the aggravating circumstances outweighed those mitigating circumstances, the Court could impose a death penalty. I have further advised my client that there is mandatory review of the imposition of the death sentence which, in my opinion, cannot be waived.

(6) In the execution of my independent professional judgment, I have advised my client that I did not think that a death penalty would be possible on the Information filed in Sweetwater County. I have reviewed the Code of Professional Responsibility, Canon 5, 6, and 7, and believe those Canons to be in conflict with the Supreme Court's ruling of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, as it pertains to this case and the death penalty statutes of the State of Wyoming.

(7) It is my opinion that the standards set forth in the Supreme Court's opinion of *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1959 [1960] ), have been met with this Defendant that he is oriented to time, place, and event and has sufficient present ability to consult with his lawyer with a reasonable degree of understanding and has a rational and factual understanding of the proceedings against him.

Signed by me in open Court in the presence of the Defendant above named and after full discussion of the contents of this certificate with the Defendant, this 23 day of Aug, 1982.

/s/ Leonard D. Munker
Attorney for the Defendant

ORDER

I find that the plea of guilty was made by the Defendant freely, voluntarily, and because he is guilty as charged, and not out of ignorance, fear, inadvertence or coercion, and with full understanding of its consequences. I further find that the Defendant has admitted the essential elements of the crime charged and is mentally competent.

IT IS THEREFORE ORDERED that the Defendant's plea of "GUILTY" be accepted and entered as prayed for in the Petition and as recommended in the certificate of his lawyer.

Done in open Court this 23rd day of August, 1982.

/s/ Kenneth G. Hamm
JUDGE
THIRD JUDICIAL DISTRICT

ROSE, Justice, dissenting.

I adhere to my position, announced in *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981) that the death penalty in all circumstances is cruel or unusual and, therefore, violative of Art. 1, §§ 14 and 15 of the Wyoming Constitution.[1] An additional fac-

1. Article 1, § 14 of the Wyoming Constitution provides in part:

" * * * Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."

tor exists in the present case which, in my opinion, compels reversal, and that is the refusal of the district court to grant the appellant's presentence motion to withdraw his plea of guilty to a crime punishable by death.

Death, the ultimate punishment, is qualitatively different from all other sanctions which the state may impose. The United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 164 (1972), recognized the unique nature of capital punishment.

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity." (Mr. Justice Stewart, concurring opinion.) 408 U.S. at 306, 92 S.Ct. at 2760.

This concept has been affirmed in subsequent capital cases, and in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Court observed:

> " * * * [D]eath is a different kind of punishment from any other which may be imposed in this country. * * * From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." 430 U.S. at 357–358, 97 S.Ct. at 1204.

Because there is no margin for error in a capital case, the courts must be vigilant in protecting the defendant's right to employ all of the safeguards afforded by our criminal justice system. In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Court said:

> " * * * Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." 428 U.S. at 305, 96 S.Ct. at 2991.

Despite the concept embodied in the above cases—that the death penalty stands upon a different constitutional footing than other criminal sanctions and necessitates specialized treatment and care by the courts—the majority treat the withdrawal of a guilty plea in a capital case no different from the withdrawal of a plea in any criminal matter (majority opinion, 672 P.2d at 788). I would hold that the unique constitutional status of the death penalty, as developed by the United States Supreme Court, beginning with *Furman v. Georgia,* supra, bears upon every phase of a capital case, including the defendant's motion to withdraw his plea of guilty pursuant to Rule 33(d), W.R.Cr.P. Rule 33(d) provides:

> "A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment or conviction and permit the defendant to withdraw his plea."

It is helpful to review the principles that have guided the courts in applying this rule in general criminal cases. Since Rule 33(d) is identical to Rule 32(d), Federal Rules of Criminal Procedure, federal case law applying Rule 32(d) has relevance for the interpretation of the Wyoming rule. *Hicklin v. State,* Wyo., 535 P.2d 743, 748 (1975).

It is inherent in the rule, and this court so held in *Hicklin v. State,* supra, 535 P.2d at 749, that a presentence motion to withdraw

Article 1, § 15 of the Wyoming Constitution provides:

"The penal code shall be framed on the humane principles of reformation and prevention."

a guilty plea is judged by a less stringent standard than a post-sentence motion. The test to be applied by the trial court in weighing plea withdrawal motions prior to sentencing is one of fairness and justice. *United States v. Stayton,* 3d Cir., 408 F.2d 559 (1969). This test has its origin in an early United States Supreme Court decision:

> "The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial *if for any reason the granting of the privilege seems fair and just.*" (Emphasis added.) *Kercheval v. United States,* 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927).

The court in *Poole v. United States,* D.C. Cir., 102 U.S.App.D.C. 71, 250 F.2d 396 (1957), in applying the "fairness and justice" standard, said:

> " * * * Leave to withdraw a guilty plea prior to sentencing should be freely allowed. As we said in *McJordan v. Huff,* 1943, 77 U.S.App.D.C. 171, 172, 133 F.2d 408, 409: ' * * * it goes without saying that a plea of guilty at that time [arraignment] can be and often is changed, on proper motion *as a matter of course.*' (Emphasis added.)" 250 F.2d at 400.

In *Ecker v. State,* Wyo., 545 P.2d 641 (1976), this court set out the following guidelines for withdrawal of a plea of guilty before sentencing:

> "Withdrawal of a plea of guilty before sentencing is not an absolute right. Denial by the district court is within its sound discretion and *there must be a plausible reason for withdrawal. United States v. Webster,* 9 Cir.1972, 468 F.2d 769, cert. den., 410 U.S. 934, 93 S.Ct. 1385, 35 L.Ed.2d 597; *United States v. Valdez,* 5 Cir.1971, 450 F.2d 1145. See also *United States v. Needles,* 2 Cir.1973, 472 F.2d

652." (Emphasis added.) 545 P.2d at 642.

In *Schmidt v. State,* Wyo. 668 P.2d 656 (1983), we equated the requirement of "a plausible reason for withdrawal" with the federal standard of a "fair and just" reason for withdrawing a plea. We held in Schmidt, however, that the presentation by the defendant of a plausible reason for withdrawal would not necessarily result in the granting of his motion to withdraw where the arraignment and acceptance of plea had been conducted in full compliance with Rule 15, W.R.Cr.P.[2]

The majority in the case at bar find no plausible reason for withdrawal of appellant's guilty plea. Accordingly, and since a procedurally correct arraignment was conducted, the majority hold that the denial of appellant's withdrawal motion did not constitute an abuse of the trial court's discretion.

I would hold that Kevin Osborn presented a good and sufficient reason for withdrawal of his plea of guilty prior to sentencing. He faced the ultimate penalty—death. Yet, his earlier guilty plea to first degree murder, if allowed to stand, would deprive him of the right to a jury determination concerning the appropriateness of the death penalty. Under our statutes,[3] the sentencing hearing upon a plea of guilty is conducted by the trial court and the defendant has no choice in the matter.

The sentencing hearing is of paramount importance in a capital case. It is at this stage that the defendant goes on trial for his life. The following argument, made in support of the application of constitutional standards of due process to the capital sentencing process, is relevant here:

> "Facts which, where a lesser sentence is involved, may be relevant solely to the question of treatment (e.g., prior criminal record, family or social background, histo-

2. Majority opinion, n. 10, 672 P.2d at 788.

3. Section 6–4–102, W.S.1977 (now § 6–2–102) provided in part:
 "(a) Upon conviction of a person for murder in the first degree the judge shall conduct a separate sentencing hearing to determine

whether the defendant should be sentenced to death or life imprisonment. The hearing shall be conducted before the judge alone if:
 * * * * * *
 "(ii) The defendant has pled guilty;"

ry of mental illness) here [capital sentencing hearing] can become relevant to the aggravation/mitigation issues and thus bear on the quality or quantum of guilt. If factual disputes are presented in these respects the constitutional standards of due process appropriate to the ascertainment of guilt should, then, apply in their resolution." *Eyman v. Alford,* 9th Cir., 448 F.2d 306, 318 (1969) (dissenting opinion).

In light of the constitutional mandate that courts be scrupulous in affording the capital defendant those safeguards to which he is entitled, the fact that Kevin Osborn was deprived of the choice to have a jury determination with respect to his life or death, constitutes, for me, a plausible, fair and just reason to grant his withdrawal motion. Therefore, I would reverse the defendant's conviction on the ground that the trial court abused its discretion in denying appellant's presentence motion to withdraw his guilty plea.